1

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
2
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
3
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
4
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
5
E-mail: ltfisher@bursor.com
            jwilner@bursor.com
6
            jglatt@bursor.com

7
*Attorneys for Plaintiffs*

8

9

10
**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**
11

12
| | |
|---|---|
| ALANA WATKINS and JO ANN ACCARDI, individually and on behalf of all other persons similarly situated, | Case No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| ILLUMINATI LABS LLC, and RISEWELL LLC, d/b/a RISEWELL, | |
| Defendants. | |

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiffs Alana Watkins and Jo Ann Accardi ("Plaintiffs"), bring this action on behalf of themselves and all others similarly situated against Defendants Illuminati Labs LLC and RiseWell LLC, d/b/a RiseWell ("Defendants" or "RiseWell").  Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

1.     Plaintiffs bring this class action lawsuit on behalf of themselves and other similarly situated consumers who purchased Defendants' RiseWell Kids Mineral Toothpaste (the "Product").[1]

2.     As one of Defendants' Instagram posts correctly explains, "the mouth is a window to your overall health."  To that end, the demand for toothpaste made with clean, natural ingredients has grown rapidly.  Indeed, McKinsey & Company estimated that U.S. consumers in 2022 spent more than $450 billion on wellness products and predicted that number would continue "growing at more than 5 percent annually."[2]

3.      Defendants' brand fits squarely into that segment: RiseWell's children's toothpaste is advertised as "natural," "safe to swallow," and chemical free for a child's safe tooth brushing.

4.     Unfortunately for consumers, however, despite the brand's express safety and clean ingredient claims, the Product contains high levels of perfluoroalkyl and polyfluoroalkyl substances, commonly known as "PFAS."  PFAS chemicals are "large, complex group[s] of synthetic chemicals" that "break down slowly, if at all."   Because PFAS chemicals do not break down quickly, if at all, these chemicals can build up in the body after repeated exposure and have

---

[1] Discovery may reveal that additional of Defendant's products are within the scope of this Complaint.  Accordingly, Plaintiffs reserve the right to include additional items identified through the course of discovery.

[2] Shaun Callaghan & Warren Teichner, et al., *Still Feeling Good: The US Wellness Market Continues to Boom*, MCKINSEY & COMPANY (Sept. 19, 2022), *available* https://www.mckinsey.com/industries/consumer-packaged-goods/our-insights/still-feeling-good-the-us-wellness-market-continues-to-boom (last accessed Feb. 13, 2024).

been linked to "increased cholesterol, changes in the body's hormones and immune system, decreased fertility, and increased risk of certain cancers."[3]

5.     Alarmingly, a Department of Defense ELAP-certified laboratory, which was commissioned to test the Product, found that it contained **over 188 parts per billion of (PPB)** of PFAS.  For reference, when researchers found 250 parts per trillion PFAS in kale, over 750 times *less* than what was found in the Product, they described being "stunned" by the "high levels" of the compounds.[4]

6.     Accordingly, Plaintiffs bring their claims against Defendants individually and on behalf of classes of all others similarly situated for (1) violation of the Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; (2) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*; (3) violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*; (4) violation of New York General Business Law § 349; (5) violation of New York General Business Law § 350; (6) Fraud; (7) Fraudulent Omission or Concealment; (8) Breach of Express Warranty; (9) Negligent Misrepresentation; and (10) Unjust Enrichment.

## PARTIES

7.     Plaintiff Alana Watkins is a citizen of California who resides in Santa Cruz, California.  As recently as December 2023, Plaintiff Watkins purchased Defendant's Kids Mineral Toothpaste for her children from Defendant's website from her home in Santa Cruz.  Prior to her purchase, Plaintiff Watkins reviewed the Product's marketing, Defendants' online advertising, health claims, ingredient and Product composition claims, and understood those representations and warranties to mean that the Product was free of harmful toxins and safe for her children to swallow.  Plaintiff purchased the Product because it was advertised as being safe to swallow and would not have purchased it or would not have made the purchase on the same terms had she known that the Product contained toxic, PFAS chemicals.

---

[3] Michigan OFAS Action Response Team, *EGLE Classroom: Introduction to PFAS*, available https://www.michigan.gov/pfasresponse/faq/categories/pfas-101 (last accessed Feb. 13, 2024).

[4] *See* Tom Perkins, *New Report Finds Most US Kale Samples Contain 'Disturbing' Levels of 'Forever Chemicals,'* THE GUARDIAN (June 30, 2023) *available* https://www.theguardian.com/environment/2023/jun/30/kale-pfas-forever-chemicals-contamination (last accessed Feb. 13, 2024).

8.     Plaintiff Watkins remains interested in purchasing natural toothpaste from Defendants that is safe for her child to use.  However, she is unable to determine if the Product is actually safe or if it contains synthetic, toxic chemicals.  As long as the Product is marketed as being "the only [toothpaste] on the market" that is "safe to swallow" and "naturally effective," when it contains known harmful PFAS chemicals, Plaintiff Watkins will be unable to make informed decisions about whether to purchase Defendants' Product and will be unable to evaluate the different prices between Defendants' Product and competitors' products.  She is further likely to be repeatedly misled by Defendants' conduct, unless and until Defendants are compelled to ensure that its marketing is accurate, non-misleading, and its Product is toxin-free.  Plaintiff Watkins would like to purchase the Product again in the future.  Had she known the true nature of the product, Ms. Watkins would have paid substantially less for it, if anything at all.

9.     Plaintiff Jo Ann Accardi is a citizen of New York who resides in Staten Island, New York.  As recently as 2023, Plaintiff Accardi purchased Defendants' Kids Mineral Toothpaste for her child from Defendants' website from her home in Staten Island.  Prior to her purchase, Plaintiff Accardi reviewed the Product's marketing, Defendants' online advertising, health claims, and ingredient and Product composition claims, and understood those representations and warranties to mean that the Product was free of harmful toxins.  Plaintiff Accardi purchased the Product because it was advertised as being safe to swallow, and toxin-free, and would not have purchased it or would not have made the purchase on the same terms, had she known that the Product contained toxic PFAS chemicals.

10.     Plaintiff Accardi remains interested in purchasing natural toothpaste from Defendants that is safe for her child to use.  However, she is unable to determine if the Product is actually safe or if it contains synthetic, toxic chemicals.  As long as the Product is marketed as being "the only [toothpaste] on the market" that is "safe to swallow" and "naturally effective," when it contains known harmful PFAS chemicals, Plaintiff Accardi will be unable to make informed decisions about whether to purchase Defendants' Product and will be unable to evaluate the different prices between Defendants' Product and competitors' products.  She is further likely to be repeatedly misled by Defendants' conduct, unless and until Defendants are compelled to

1   ensure that its marketing is accurate, non-misleading, and its Product is toxin-free.  Plaintiff

2   Accardi would like to purchase the Product again in the future.  Had she known the true nature of

3   the product, Ms. Accardi would have paid substantially less for it, if anything at all.

4          11.     Defendant Illuminati Labs LLC is a Colorado limited liability corporation with its

5   principal place of business at 2513 Elmira Street, Aurora, Colorado 80010.  Defendant Illuminati

6   Labs is the parent of RiseWell LLC who, together, produce, manufacture, market, and sell

7   toothpaste, including the Product, throughout California, New York, and the United States.

8          12.     Defendant RiseWell LLC is a New York Limited Liability Company with its

9   principal place of business at 82 Beaver Street, New York, NY 10005.  Defendant RiseWell, with

10  its parent Illuminati Labs LLC, produce, manufacture, market, and sell toothpaste, including the

11  Product, throughout California, New York, and the United States.

12                          **JURISDICTION AND VENUE**

13         13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as

14  modified by the Class Action Fairness Act ("CAFA"), because at least one member of the Class is

15  a citizen of a different state than Defendants, there are more than 100 members of the Class, and

16  the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

17         14.     This Court has personal jurisdiction over Defendants because Defendants conduct

18  substantial business within California, including in this District and purposefully avails themselves

19  to the benefits of this District.  In addition, a substantial portion of the events giving rise to

20  Plaintiffs' claims occurred in this District.

21         15.     Venue is proper in this District under 28 U.S.C. § 1391 because a substantial portion

22  of the events, omission, and acts giving rise to the claims herein occurred in this District.

23                          **FACTUAL ALLEGATIONS**

24  **I.     Exposure To PFAS Chemicals.**

25         16.     "PFAS are man-made chemicals that have been used in industry and consumer

26  products worldwide since the 1940s.  They have been used to make nonstick cookware, water-

27

28

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    4

repellent clothing, stain resistant fabrics and carpets, some cosmetics, some firefighting foams, and products that resist grease, water, and oil."[5]

17.     PFAS are large, complex groups of synthetic chemicals that break down slowly, if at all, and as such can accumulate in the body once someone has ingested them.[6]  PFAS exposure can occur by using products made with PFAS or products that are packaged in materials containing PFAS, among others.[7]  PFAS chemicals have also been found in water supplies.[8]  PFAS have been linked to "increased cholesterol, changes in the body's hormones and immune system, decreased fertility, and increased risk of cancers."[9]

18.     Indeed, in 2021, the Biden Administration, taking on "accelerated efforts to protect Americans from per- and polyfluoroalkyl substances (PFAS), which can cause severe health problems and persists in the environment once released, posing a serious threat across rural, suburban, and urban areas," announced an agency plan to "prevent PFAS from being released into the air, dirking systems, and [the] food supply … to remediate the impact of these harmful pollutants."[10]  Taking action to protect people from PFAS exposure, in April 2024, the White House announced a plan to create "the first-ever national legally enforceable drinking water

---

[5] Agency for Toxic Substances and Disease Registry, *What are PFAS?* U.S. DEP'T OF HEALTH & HUM. SERVS., (Jan. 18, 2024) *available* https://www.atsdr.cdc.gov/pfas/health-effects/overview.html (last accessed Mar. 11, 2024).

[6] Nat'l Inst. of Health, *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, U.S. DEP'T. OF HEALTH AND HUM. SERVS., https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm (last accessed Mar. 11, 2024).

[7] EPA, *Our Current Understanding of the Human Health and Environmental Risks of PFAS,* (June 7, 2023) *available* https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-Risks-pfas#:~:text=Current%20research%20has%20shown%20that,may%20contain%20PFAS%2C%20including%20fish (last accessed Mar. 11, 2024).

[8] U.S. Env't. Protection Agency, *PFAS Explained*, Oct. 25, 2023, *available* https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/10/fact-sheet-biden-harris-administration-takes-critical-action-to-protect-communities-from-pfas-pollution-in-drinking-water/ (last accessed May 15, 2024).

[9] Michigan PFAS Action Response Team, *EGLE Classroom: Introduction to FPAS*, https://www.michigan.gov/pfasresponse/faq/categories/pfas-101 (last accessed Mar. 11, 2024).

[10] *Fact Sheet: Biden-Harris Administration Launches Plan to Combat PFAS Pollution*, The White House (Oct. 18, 2021), *available* https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/18/fact-sheet-biden-harris-administration-launches-plan-to-combat-pfas-pollution/ (last accessed Mar. 11, 2024).

---

standard for PFAS, which will protect 100 million people from PFAS exposure, prevent tens of thousands of serious illnesses, and save lives."[11]

19.     Likewise, "[p]rior studies have shown that PFAS in food packaging can leach into food and higher levels of PFAS have been found in blood testing of people who regularly eat types of foods that are typically sold in PFAS-containing packaging."[12]

20.     The level of risk presented by PFAS chemical exposure varies depending on the recipient.  In children, PFAS have been linked to "[l]ower antibody response[s] to some vaccines,"[13] thereby rending children more vulnerable to diseases they were otherwise immunized from.  In fact, the American Academy of Pediatrics has found that "[c]hildren are more vulnerable to environmental pollutants like PFAS than adults because of … lower body weight, differences in water and food intake, developing organ systems and longer lifespans during which toxic effects might manifest."[14]  Accordingly, the presence of PFAS in toothpaste, like Defendant's, is particularly alarming because this Product is specifically intended for children.  But, regardless of a person's stage in life, "[v]irtually no amount of PFAS is safe for consumption, according to the U.S. Environmental Protection Agency."[15]

---

[11] THE WHITE HOUSE, *Fact Sheet: Biden-Harris Administration Takes Critical Action to Protect Communities from PFAS Pollution in Drinking Water*, April 10, 2024, available https://www.whitehouse.gov/briefing-room/statements-releases/2024/04/10/fact-sheet-biden-harris-administration-takes-critical-action-to-protect-communities-from-pfas-pollution-in-drinking-water/ (last accessed May 15, 2024).

[12] Int'l Pollutants Elimination Network, *McDonald's, KFC, Burger King, Subway, Starbucks, Dunkin' Donuts, and Jolly Time Found to Have Inconsistent use of PFAS and PFAS-Free Packing,* IPEN FOR TOXICS-FREE FUTURE (Dec. 13, 2023) *available* https://ipen.org/news/single-use-food-packaging-17-countries-contains-pfas-%E2%80%9Cforever-chemicals%E2%80%9D#:~:text=Prior%20studies%20have%20shown%20that,sold%20in%20PFAS%2Dcontaining%20packaging (last accessed Mar. 11, 2024).

[13] Agency for Toxic Substances and Disease Registry, *supra* note 5.

[14] Alan D. Woolf, M.D., M.P.H., FAAP, & Lauren Zajac, M.D., M.P.H., FAAP., *Report Outlines Health Effects of PFAS Chemicals in Children, Provides Recommendations for Testing,* AM. ACAD. OF PEDIATRICS (Sept. 13, 2022) *available* https://publications.aap.org/aapnews/news/22138/Report-outlines-health-effects-of-PFAS-chemicals?autologincheck=redirected (last accessed Mar. 11, 2024).

[15] Wisconsin Watch, *What Should I do about PFAS in my Water?* PBS WISCONSIN (Nov. 28, 2022) *available* https://pbswisconsin.org/news-item/what-should-i-do-about-pfas-in-my-water/#:~:text=How%20much%20PFAS%20is%20harmful,the%20U.S.%20Environmental%20Protection%20Agency (last accessed Mar. 11, 2024).

21.     Toothpaste is a particularly effective method to introduce PFAS substances into the body.  The mouth and oral lining tissue are efficient entry points for both children and adults. Specifically, oral absorption occurs either via the oral mucosa, which is the mucous membrane lining the "skin" inside the mouth, including the cheeks and lips,[16] or through the sublingual mucosa, which refers to the tongue and the floor of the mouth.[17]  Both areas efficiently usher particulates into the bloodstream.  This is because, in the case of absorption through oral mucosa, "[t]here are tiny blood vessels in the cheek area, allowing [] [substances] to be absorbed directly into the bloodstream, bypassing the digestive system."[18]  Similarly, particulates introduced to the sublingual mucosa are absorbed "directly in to the blood stream through the ventral surface of the tongue and floor of the mouth … [allowing] rapid absorp[tion]" into the system of facial veins that connects to the rest of the body's systemic circulation.[19]  In fact, "[t]he absorption of [a] drug through the sublingual route is 3 to 10 times greater than [the] oral route and is only surpassed by hypodermic injection."[20]  Thus, the presence of PFAS in toothpaste poses a particular danger to users because of the body's efficiency in oral absorption.

22.     As a result, there is a growing consumer demand to eliminate PFAS from various consumer products, including oral hygiene products.[21]

---

[16] Dep't. of Dermatology, *Oral Mucosal Diseases*, UNIV. OF CAL., DAVIS, *available* https://health.ucdavis.edu/dermatology/specialties/medical/oral.html (last accessed Mar. 11, 2024).

[17] Neha Narang & Jyoti Sharma, *Sublingual Mucosa As a Route for Systemic Drug Delivery*, 3 (2) INT'L J. PHARMACY & PHARM. SCI. 18-22, 18 (2011) *available* https://innovareacademics.in/journal/ijpps/Vol3Suppl2/1092.pdf (last accessed Mar. 11, 2024).

[18] Avior Nutritionals, *What is Buccal & Sublingual Absorption and Why Are They So Important?* (May 16, 2019) *available* https://www.aviornutritionals.com/what-is-buccal-sublingual-absorption-and-why-are-they-so-important/ (last accessed Mar. 11, 2024).

[19] Neha Narang & Jyoti Sharma, *supra* note 17.

[20] *Id.*

[21] Elicia Mayuri Cousins, et al., *Risky Business? Manufacturer and Retailer Action to Remove Per- and Polyfluorinated Chemicals from Consumer Products*, NEW SOLUTIONS: J. OF ENV'T & OCCUPATIONAL HEALTH POL'Y (2019) 29(2), 242-65, doi: 10.1177/104829111985674.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**II.     Defendants' Representations Are Actionable**

    **A.     Defendants Use Their Website to Make Express, But Untrue, Health and Safety Claims About its Product.**

23.     Plaintiffs' counsel commissioned a Department of Defense Environmental Laboratory Accreditation Program-certified laboratory to test Defendants' Kids Mineral Toothpaste.  Both the packaging and the toothpaste itself were tested, which showed that the Product was contaminated with over 188 parts per billion (PPB) of PFAS chemicals.

24.     These results are contrary to the warranties and representations made throughout Defendants' marketing.  Defendants' material omissions therefore harmed Plaintiffs.

25.     For example, Defendants expressly warrant that the Product is "100% safe to swallow" on the checkout page on its website.[22]



26.     Defendants bookend their "safe to swallow" claim by explaining on the Product's page that it is "naturally effective" and relies on "a naturally occurring mineral" while assuring

---

[22] Risewell, *Kids Mineral Toothpaste*, available https://risewell.com/products/risewell-kids-toothpaste (last accessed May 14, 2024).

consumers like Plaintiffs that there's "no need to be nervous when your little ones begin learning to brush!"[23]

**What makes our kids toothpaste special and naturally effective?**

 

Finally there's a treat that naturally strengthens your kid's teeth! The secret is Hydroxyapatite, a naturally occurring mineral (and our signature ingredient!) that protects and remineralizes your kid's teeth as they grow. And, it is 100% safe to swallow, so no need to be nervous when your little ones begin learning to brush!

27.     In fact, in doubling down on the "safe to swallow" claim, Defendants explain that "since the rest of our ingredients are also all safe, you have nothing to worry about when using our natural fluoride-free toothpaste, morning, noon, or night."[24]

**So safe you can eat it**

...but that might be weird

Because Hydroxyapatite is a naturally occurring mineral in our teeth and bones, it's completely harmless if accidentally ingested. And since the rest of our ingredients are also all safe, you have nothing to worry about when using our natural fluoride-free toothpaste, morning, noon, or night.



28.     Defendants, as leading manufacturers, marketers, and sellers of children's toothpaste, know the importance of ensuring that a toothpaste brand specifically intended for children is safe to swallow.  In fact, it is fairly common, if not expected, that children will swallow toothpaste.  One study of a "sample size comprised [of] 75 parents of children between the age group of 3 and 5 years" found that "83% of the children have the habit of toothpaste swallowing."[25]

---

[23] *Id.*

[24] RiseWell, *Backed by Science to Conquer Cavities Naturally,* available https://risewell.com/pages/science (last accessed May 14, 2024).

[25] B. Aishwarya Reddy, et al., *Prevalence of Toothpaste Swallowing Habit in Children Between the Age Group of 3 and 5 Years*, Drug Intervention Today 12(7) (March 2019) 1452-1455, *available*

29.     What is more, Defendants charge a premium for its Product.  In 2023, the average price for a tube of toothpaste was $3.92.[26]  Defendants, however, charge either $12.00 per tube for a one-time purchase or $10.20 for consumers with recurring order subscriptions.  Defendants justify the high price premium by distinguishing their toothpaste from competitors' brands based on health, safety, and ingredient quality and transparency claims.  For example, Defendants refers to the Product as having "extra special benefits" for children and offers the "safest" ingredients[27]:




30.     And if that wasn't enough, Defendants publish a grid, capturing what they call "The RiseWell Difference," directly comparing the Product to "natural" and "traditional" competitors.  Among the attributes Defendants claim set its Product apart from competitors' products are

https://www.researchgate.net/publication/335523804_Prevalence_of_toothpaste_swallowing_habit_in_children_between_the_age_group_of_3_and_5_years (last accessed May 14, 2024).

[26] The Council for Community and Economic Research, *Just a Tube of Toothpaste or a Teller of Tumultuous Times?* available https://www.coli.org/just-a-tube-of-toothpaste-or-a-teller-of-tumultuous-times/#:~:text=According%20to%20the%20most%20recent,to%20%243.92%20in%20Q3%202023 (last accessed May 14, 2024).

[27] RiseWell, *supra* note 20.

"[i]ngredients you can pronounce" that are "[n]aturally effective ingredients," culminating in a children's toothpaste that is "[s]afe enough to eat." [28] Most concerningly, Defendants falsely assure parents, like Plaintiffs, that, "[u]nlike many natural toothpastes, we don't just remove the toxic ingredients found in traditional toothpaste; we swap in 100% safe, natural alternatives that clean and protect just as effectively."

The **RiseWell** Difference

Unlike many natural toothpastes, we don't just remove the toxic ingredients found in traditional toothpastes; we swap in 100% safe, natural alternatives that clean and protect just as effectively.

| | RiseWell | Natural | Traditional |
|---|---|---|---|
| Fluoride-Free | ✓ | ✓ | ✗ |
| Hydroxyapatite to remineralize | ✓ | ✗ | ✗ |
| Naturally effective ingredients | ✓ | ✗ | ✗ |
| Safe enough to eat | ✓ | ∼ | ✗ |
| No harsh foaming agents like SLS | ✓ | ∼ | ✗ |
| No Propylene Glycol (antifreeze) | ✓ | ∼ | ✗ |
| No mystery "natural flavors" | ✓ | ∼ | ✗ |
| Ingredients you can pronounce | ✓ | ∼ | ✗ |

✓ You bet!   ∼ Some   ✗ None

31.   Defendants rely heavily on its safety representations, but aside from the larger health effects of PFAS exposure found in its Product, testing revealed the presence of perflourodecanoic acid. Worryingly, a study of 629 U.S. children aged 3-11 found that "perfluorodecanoic acid was significantly associated with dental caries[.]" [29] "Dental caries, which

---

[28] RiseWell, *supra* note 22.

[29] R. Constance Wiener, DMD, PhD & Chrisopher Waters, MS, *Perfluoroalkyls/polyfluoroalkyl Substances and Dental Caries Experience in Children, Ages 3-11 Years, National Health and Nutrition Examination Survey*, 2013-2014, J. Public Health Dent. (2019) 79(4), 307-319, 313, *available* doi: 11.1111/jphd/12329.

is also referred to as tooth decay or cavities, is one of the most common and widespread persistent diseases today and is also one of the most preventable."[30]  Accordingly, as the researchers of the aforementioned study explained, "[a]s perfluorodecanoic acid is a larger, stable perfluoroalkyl with associated adverse health effects, having a trend of fewer exposures is a public health benefit."[31]

32.     Nonetheless, Defendants attempt to make its claims credible to consumers by promising consumers that their labeling practices are more trustworthy than competitors' labeling practices.  Defendants ironically note that "[t]he lack of regulation within the cosmetic industry permits the use of harmful ingredients, making it easy for many companies to hide behind labels like 'natural ingredients,'" assuring consumers instead that, unlike its shifty competitors, RiseWell "let[s] you know every ingredient in all of [its] products."[32]  Unfortunately for Plaintiffs, this promise does not include disclosing high levels of toxic PFAS chemicals.

33.     RiseWell's physical packaging does not fare much better.  Both the external box and the tube represent and warrant that the toothpaste is "Naturally whitening," and contains "Only Good Stuff."

[SPACE INTENTIONALLY LEFT BLANK]

---

[30] Oral-B, *What are Dental Caries? Treatments, Signs, and Symptoms*, available https://oralb.com/en-us/oral-health/conditions/cavities-tooth-decay/what-are-dental-caries/ (last accessed May 23, 2024).

[31] R. Constance Weiner, *et al, supra* note 29.

[32] RiseWell, *supra* note 28.



34.     The back of the tube also makes untrue guarantees.  The marketing on the back of the tube represents that "RiseWell Kids Toothpaste is like no other natural toothpaste out there. … Our goal is to give your kids a toothpaste that is as effective as chemical toothpastes, but without toxins.  So, instead of simply eliminating these chemicals, we found replacements that are not only natural and completely safe but also incredibly effective."[33]

[SPACE INTENTIONALLY LEFT BLANK]

---

[33] RiseWell, *supra* note 22.



35.     Defendants' health representations track with marketing trends for children's toothpaste. This is because of the unique market position that the massive children's toothpaste segment holds. "The market is defined by the development and manufacturing of toothpaste products that are specifically designed to meet the needs of children. This includes taking into account elements like taste appeal, age-appropriate fluoride levels, and visually appealing packaging. The main goal of children's toothpaste is to promote preventative dental health practices, lower the risk of dental problems, and establish and maintain good oral hygiene habits from an early age."[34]  Therefore, "the children's toothpaste market closely follows larger trends in health and wellbeing. Growing consumer sophistication among parents is pressuring product makers to use substances that are seen as safe and mild in addition to being effective. This approach presents children's toothpaste as a crucial part of comprehensive pediatric healthcare, in

---

[34] Verified Market Reports, *Global Children Toothpaste Market by Type (Fluoride Toothpaste, Fluoride-Free Toothpaste), By Application (Online Stores, Offline Stores), by Geographic Scope And Forecast*, December 2023, available https://www.verifiedmarketreports.com/product/children-toothpaste-market-size-and-forecast/ (last accessed June 4, 2024).

line with an increased understanding of the long-term effects of oral hygiene practices on general health."[35]  Accordingly, Defendants' material omissions harmed Plaintiffs.  Defendants, as major manufacturers, marketers, and sellers in this space, likely understand the market trends and consumer preferences in this space and calibrate their marketing and advertising accordingly.

**B.     Defendants Make Similar Representations Throughout RiseWell's Online Presence**

36.     Defendants reiterate the claims on their website throughout their online marketing and third-party website points of sale.  On its Amazon page, RiseWell assures parents that they can "[r]est easy knowing that our fluoride free kids toothpaste is 100% safe to swallow and eat.  It offers peace of mind for parents and a worry-free brushing experience for their little ones."[36]  RiseWell also assures parents that they can "[s]ay goodbye to artificial colors, flavors, and preservatives with our natural kids toothpaste, providing a pure and natural option for your child's dental hygiene needs."[37]

37.     RiseWell repeats these similar claims on the  Walmart sales page for the Product.  Under its product details, it explains that "[d]aily usage will leave your kid's teeth visibly whiter, healthier, and stronger as their smiles grow and mature.  And the best part? It's safe enough to eat—even if your kids … eat a whole delicious tube."[38]

38.     RiseWell's health and safety representatives are not limited to its website and third-party sales pages.  RiseWell's Facebook marketing echoes the same claims made on its website.

39.     Defendant's advertising online (and on its packaging) is uniform and pervasive.

---

[35] *Id.*

[36] Amazon.com, *RiseWell Kids Mineral Toothpaste – Kids Hydroxyapatite Toothpaste – Safe to Swallow, Fluoride & SLS Free Toothpaste for Kids – Case Batter, 3.4 Oz.,* available https://www.amazon.com/Risewell-Kids-Batter-Hydroxyapatite-Toothpaste/dp/B0B249Q6MF (last accessed May 15, 2024).

[37] *Id.*

[38] Walmart.com, *Risewell Kids Cake Batter Hydroxyapatite Toothpaste*, available https://www.walmart.com/ip/Risewell-Kids-Cake-Batter-Hydroxyapatite-Toothpaste/2285120002?from=/search (last accessed May 15, 2024).

1
2
3
4
5
6
7
8
9
10
11



12      40.     Similarly, RiseWell's own Instagram and TikTok posts are intended to impress

13  upon consumers that the brand is in lockstep with its health-conscious consumers who are in the

14  market for a purported "non-toxic" natural, oral health product.

15
16
17
18
19
20
21
22
23
24
25

 

26      41.     But, despite RiseWell's repeated, affirmative claims that the Product is 100% safe to

27  swallow and only contains clean, safe ingredients, Defendants omit the fact that the Product

28

contains high levels of toxic, PFAS chemicals, which are efficiently absorbed into the body through oral absorption and ingestion.

42.     However, Plaintiffs and the members of the Classes bargained for a product that is made from clean ingredients and completely free of harmful toxins and were thus deprived of the basis of their bargain when Defendants sold them a Product it both affirmatively represented as meeting those desires and contrasted from products that did not.  RiseWell elected to engage in this marketing despite the Product containing high levels of toxic PFAS chemicals, thereby exposing consumers and their children to various health risks that they sought to avoid by buying the product.

43.     No reasonable consumer would expect the Product, which was marketed prominently as a safe to swallow, completely natural, toxic-free toothpaste, to contain harmful PFAS chemicals.

44.     In addition, because the facts concern a critical safety-related deficiency in the Product, and because Defendants affirmatively and expressly represented otherwise, Defendants were under a continuous duty to disclose to Plaintiffs and the members of the Classes the true standard, quality, and grade of the Product and to disclose that the Product contained substances known to have adverse health effects.  Defendants also had a duty to disclose because of its exclusive and/or superior knowledge concerning the true nature and composition of the Product as the owner, manufacturer, producer, marketed, and seller of the Product.  Nonetheless, Defendants concealed this material information and affirmatively warranted the opposite.

45.     Moreover, given the randomized sample that was tested, it is likely that dangerous PFAS chemicals are present in the Product generally, not simply this one Product.

46.     Although Defendants are in the best and exclusive position to know the true composition and contents of its Product, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

47.     **WHO:**  Defendants Illuminati Labs LLC and RiseWell LLC, doing business as RiseWell.

48.     **WHAT:**  Defendants' conduct here was, and continues to be, fraudulent because they omitted and concealed that the Product contained PFAS—which are widely known to have significant negative health repercussions.  Thus, Defendants' conduct deceived Plaintiffs and the members of the Classes into believing that the Product is natural and toxin-free and thus safe to swallow when it is not.  As demonstrated by Defendants' intense focus on positioning itself as a toxin-free, natural, safe-to-swallow brand and directly comparing and contrasting those qualities to competitor brands, Defendants knew or reasonably should have known that this information is material to reasonable consumers, including Plaintiffs and the members of the Classes when they make their purchasing decisions, yet it continued to pervasively and affirmatively warrant and represent that the Product was of a clean, natural, toxic-free quality and character when it is not.

49.     **WHEN:**  Defendants made material representations and omissions during the putative class periods, including prior to and at the time of Plaintiffs' and the Class Members' purchases.  Plaintiffs viewed the packaging and advertising of the Product online at purchase and viewed the representations and warranties made by Defendants, understanding them to mean precisely what they say—that the Product is a uniquely safe, natural, toxic-free, safe-to-swallow toothpaste fit for safe use by children, produced by a health-conscious brand.

50.     **WHERE:**  Defendants' marketing messages were uniform and pervasive throughout California, New York, and the United States and carried throughout material misrepresentation, warranties, and omissions on its labeling, packaging, and marketing materials.

51.     **HOW:**  Defendants made material misrepresentations and omissions of fact regarding the Product by representing and warranting that the Product was made of only natural ingredients and that it is therefore toxin-free and safe to swallow when the Product actually contained high levels of harmful, toxic, PFAS chemicals.

52.     **WHY IT IS FALSE:**  Defendants made material representations and warranties that its Product is a "100% safe to swallow," toxin-free children's toothpaste comprised of only natural ingredients.  In addition, Defendants compare its Product and the Product's composition to that of competitors to demonstrate to consumers that the brand and Product are uniquely positioned as more honest about its ingredients, which it represents as safe, natural and toxin-free.  However,

1   the Product contains high levels of toxic, unsafe, unnatural PFAS chemicals, which is contrary to

2   RiseWell's affirmative representations and warranties.

3        53.    **INJURY:** Plaintiffs and the members of the Classes purchased, and paid a

4   premium, or otherwise paid more for the Product they otherwise would not have had they known

5   known the truth of Defendants' product and had not reasonably relied on its representations and

6   warranties.

7                            <u>**CLASS ALLEGATIONS**</u>

8        54.    Plaintiffs bring this matter on behalf of themselves, and all similarly situated in the

9   following Classes (collectively, the "Classes"):

10          ***Nationwide Class.***  All natural persons in the United States who purchased the
            Product, and all substantially similar products, from June 11, 2020, to present.

11

12       55.    Plaintiff Watkins seeks to represent the following Subclass:

13          ***California Subclass.***  All natural persons in the State of California who purchased
            the Product, and all substantially similar products, from June 11, 2020, to present.

14       56.    Plaintiff Accardi seeks to represent the following Subclass:

15          ***New York Subclass.***  All natural persons in the State of New York who purchased
            the Product, and all substantially similar products, from June 11, 2020, to present.

16

17       57.    Excluded from the Classes are: (1) any Judge or Magistrate presiding over this

18   action and any members of their families; (2) Defendants, Defendants' subsidiaries, parents,

19   successors, predecessors, and any entity in which Defendants or their parent have a controlling

20   interest and their current or former employees, officers, and directors; and (3) Plaintiffs' counsel

21   and Defendants' counsel.

22       58.    **Numerosity.**  Class Members are so numerous that joinder of all members is

23   impracticable.  Plaintiffs believe that there are thousands of people who purchased the Product and

24   substantially similar versions of the Product who have been injured by Defendants' false and

25   misleading representations.  While the exact number of members of each Class is unknown to

26   Plaintiffs at this time, such information can be ascertained through appropriate discovery from

27   records maintained by Defendants and their agents.

28

---

59.     **Commonality and Predominance.**  The questions of law and fact common to the

Classes which predominate over any questions which may affect individual class members include,

but are not limited to:

        i.   Whether Defendants' Product contains PFAS;

       ii.   Whether Defendants represented and warranted that the Product was natural, safe to swallow, and toxin-free;

     iii.   Whether Defendants breached those representations and warranties;

     iv.   Whether Plaintiffs and the members of the Classes reasonably relied on Defendants' representations, warranties, and omissions;

      v.   Whether Defendants' conduct violated California's consumer protection statutes;

     vi.   Whether Defendants' conduct violated New York's consumer protection statutes;

    vii.   Whether Defendants' conduct amounted to violations of the common law; and

   viii.   Whether the knowledge of the presence (or risk thereof) of PFAS in the Product would be material to a reasonable consumer.

60.     **Typicality.**  The claims of the named Plaintiffs are typical of the claims of the

members of the Classes because the named Plaintiffs, like other members of the Classes, purchased

the Product and Defendants' substantially similar Products, relying on the representations and

warranties made by Defendants on the Product's packaging and online, that the Product was safe

for children to use, and free of harmful toxins.

61.     **Adequate Representation.**  Plaintiffs have retained and are represented by

qualified and competent counsel who are highly experienced in complex consumer class action

litigation.  Plaintiffs and their counsel are committed to vigorously prosecuting this class action.

Neither Plaintiffs, nor their counsel, have any interest adverse to, or in conflict with, the interests of

the absent members of the Classes.  Plaintiffs are able to fairly and adequately represent the interest

of the Classes.  Plaintiffs have raised viable statutory claims of the type reasonably expected to be

raised by members of the Classes and will vigorously pursue those claims.  If necessary, Plaintiffs

1    may seek leave of this Court to amend this complaint to include additional Class Representatives to

2    represent the Class or additional claims as may be appropriate.

3    62.    **Superiority.**  A class action is superior to other available methods for the fair and

4    efficient adjudication of this controversy because individual litigation of the claims of all members

5    of the Classes is impracticable.  Even if every member of the Classes could afford to pursue

6    individual litigation, the Court system could not.  It would be unduly burdensome to the courts in

7    which individual litigation of numerous cases would proceed.  Individualized litigation would also

8    present the potential for varying, inconsistent, or contradictory judgments, and would magnify the

9    delay and expense to all parties and to the court system, resulting in multiple trials of the same

10   factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or

11   all of the issues presented herein, presented fewer management difficulties, conserves the resources

12   of the parties and of the court system and protects the rights of each member of the Classes.

13   Plaintiffs anticipate no difficulty in the management of this action as a class action.  Class-wide

14   relief is essential to compel compliance with California and New York's consumer protection laws.

## CAUSES OF ACTION

### COUNT I
**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**California Civil Code § 1750, *et seq.***
**(On Behalf of the California Subclass)**

19   63.    Plaintiff Watkins incorporates the foregoing allegations as if fully set forth herein.

20   64.    Plaintiff Watkins brings this claim individually and on behalf of the California

21   Subclass.

22   65.    Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods … have sponsorship,

23   approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…."

24   66.    Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a

25   particular standard, quality, or grade, or that they goods are of a particular style or model, if they

26   are of another."

27   67.    Civil Code § 1770(a)(9) prohibits "advertising goods … with intent not to sell them

28   as advertised."

68.    Defendants violated Civil Code §§1770(a)(5), (a)(7), and (a)(9) by holding out the Product as being made from only natural and safe ingredients, such that it is safe enough to swallow, when, in fact, the Product contained high amounts of unsafe, unnatural, toxic, PFAS chemicals.

69.    The Product is thus not healthy for the consumer, nor comprised of only natural ingredients.

70.    Defendants made their representations to Plaintiff and the members of the California Subclasses while suppressing the true nature of the Product.  Specifically, Defendants displayed the Product and described it as wholly comprised of only clean, natural ingredients and thereby safe to swallow, including on the Product's packaging, on its website, and in its marketing, without disclosing that the Product contains toxic, PFAS chemicals.  As such, Defendants affirmatively misrepresented, *inter alia*, the ingredients, quality, and grade of the Product while continuing to advertise the goods without the intent to sell them as advertised.

71.    Plaintiff Watkins and the Subclass suffered harm as a result of the violations of the CLRA because they incurred, charged, and/or paid monies for the Product that they otherwise would not have incurred or paid and were unknowingly exposed to a significant and substantial health risk.

72.    On April 23, 2024, prior to filing this complaint, Defendants' Counsel accepted service of Plaintiffs' demand letter via email.  The letter advised Defendant that it was in violation of the CLRA with respect to the presence of PFAS in the Product, and demanded that it cease and desist from such violations and make full restitution by refunding the monies received therefrom. The letter stated that it was sent on behalf of all other similarly situated purchasers.

73.    Defendants failed to remedy the issues raised by the notice letter.

74.    Pursuant to Civ. Code § 1780, Plaintiff and the Subclass seek: (a) actual damages in an amount to be determined at trial; (b) an order enjoining Defendant from continuing its violative acts and practices; (c) restitution of all money and property lost by Plaintiff and the Subclass as a result of Defendant's unlawful conduct; (d) punitive damages; (e) any other relief that the Court deems proper; and (f) attorneys' costs and fees.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT II
### Violation of California's Unfair Competition Law,
### Cal. Bus. & Prof. Code § 17200, *et seq.*
### (On Behalf of the California Subclass)

75.     Plaintiff Watkins incorporates the foregoing allegations as if fully set forth herein.

76.     Plaintiff Wakins brings this claim individually and on behalf of the Subclass against Defendant.

77.     California Business and Professions Code § 17200 prohibits "any unlawful, unfair, or fraudulent business act of practice."  By committing the acts and practices alleged herein, Defendant has violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17210 by engaging in unlawful, unfair, and fraudulent conduct.

78.     Defendants violated the UCL's proscription against engaging in **Unlawful Business Practices** by violating the CLRA, Cal. Civ. Code §§ 1770(a)(5), (a)(7), and (a)(9), as well as by violating California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*

79.     As more fully described above, Defendants' misleading marketing, advertising, packaging, and labeling of its Product is likely to deceive reasonable consumers.  In addition, Defendants have committed unlawful business practices by, *inter alia*, making the representations and omissions of material facts, as set forth more fully above, thereby violating the common law.

80.     Plaintiffs and Classes reserve the right to allege other violations of law which constitute other unlawful business acts or practices.

81.     Defendants also violated the UCL's prohibition against engaging in **Unfair Business Practices.**  Defendants' acts, omissions, misrepresentations, practices, and non-disclosures as alleged herein also constituted "unfair" business acts and practices within the meaning of Bus. & Prof. Code § 17200, *et. seq.*, as the conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.

82.     There were reasonably available alternatives to further Defendants' legitimate business interest other than the conduct described above.  There are no legitimate business

purposes served by Defendants' conduct, which caused Plaintiff and the Subclass economic injury because they purchased a Product, the basis of the bargain for which was untrue.

83.     Defendants have further violated the UCL's proscription against engaging in **Fraudulent Business Practices.**  Defendants' claims, nondisclosures, and misleading statements with respect to the Product, as more fully set forth above, were false, misleading, and/or likely to deceive the consuming public within the meaning of Bus. & Prof. Code § 17200.

84.      Plaintiffs and the Classes suffered a substantial injury by virtue of buying the Product that they would not have purchased absent Defendants' unlawful, fraudulent, and unfair marketing, advertising, packaging, and omission about the inclusion of harmful toxins in its Product.

85.     There is no benefit to consumers or competition from deceptively marketing and omitting material facts about the true nature of the Product.

86.     Plaintiffs and the Classes had no way of reasonably knowing that the Product they purchased was not truthfully marketed, advertised, packaged, or labeled.  Thus, they could not have reasonably avoided the injury each of them suffered.

87.     The gravity of the consequences of Defendants' conduct as described outweigh any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace.  Such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiffs and the other members of the Classes.

88.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and the Subclasses seek an order of this Court that includes, but is not limited to, requiring Defendant to (a) provide restitution to Plaintiffs and other Subclass Members; (b) disgorge all revenues obtained as a result of violations of the UCL; and (c) pay Plaintiff's attorneys' fees and costs.

**COUNT III**
**Violation of California's False Advertising Law,**
**Cal. Bus. & Prof. Code § 17500, *et seq.***
**(On Behalf of the California Subclass)**

89.     Plaintiff Watkins incorporates the foregoing allegations as if fully set forth herein.

90.     Plaintiff Watkins brings this claim on behalf of herself and the California Subclass against Defendant.

91.     Defendants' acts and practices, as described herein, have deceived and/or are likely to continue to deceive, members of the California Subclass and public.  As described throughout this Complaint, Defendants misrepresented the Product as wholly natural, free from toxic chemicals, and therefore safe to swallow when, in fact, the Product is not wholly natural, free from toxic chemicals, or safe to swallow because of the inclusion of PFAS chemicals.

92.     By their actions, Defendants disseminated uniform advertising regarding the Product across California and the U.S.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*.  Such advertisements were intended to and likely did deceive the consuming public.

93.     The above-described false, misleading, and deceptive advertising Defendants disseminated continue to have a likelihood to deceive in that Defendants failed to disclose that the Product contains substances that pose a significant risk to the health of consumers or correct their advertising.

94.     Defendants continue to misrepresent to consumers that the Product is safe to swallow, natural, and toxin-free when, in fact, the Product is not.

95.     In making and disseminating these statements, Defendants knew, or should have known, their advertisements were untrue and misleading in violation of California law.  Plaintiffs and members of the California Subclass based their purchasing decisions on Defendants' omitted material facts.  The revenue attributable to the Product sold in those false and misleading advertisements likely amounts to millions of dollars.  Plaintiff Watkins and members of the California Subclass were injured in fact and lost money and property as a result.

96.     The misrepresentations and non-disclosures by Defendants of the material facts described and detailed herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code § 17500, *et. seq.*

97.     As a result of Defendants' wrongful conduct, Plaintiff Watkins and members of the California Subclass lost money in an amount to be proven at trial.  Plaintiff Watkins and the Subclass are therefore entitled to restitution as appropriate for this cause of action.

98.     Plaintiff Watkins and California Subclass seek all monetary and non-monetary relief allowed by law, including (a) restitution of all profits stemming from Defendant's unfair, unlawful, and fraudulent business practices; (b) declaratory relief; (c) reasonable attorneys' fees and costs under California Code Civ. Proc. § 1021.5; and (e) injunctive relief, and other appropriate equitable relief.

**COUNT IV**
**Violation of New York's General Business Law § 349**
**(On Behalf of the New York Subclass)**

99.     Plaintiff Accardi incorporates the foregoing allegations as if fully set forth herein.

100.     Plaintiff Accardi brings this claim on behalf of herself and the New York Subclass.

101.     The acts of Defendants, as described above, and each of them, constitute unlawful, deceptive, and fraudulent business acts and practice.

102.     Defendants market the Product as conferring certain health, safety, and use benefits, when testing demonstrates that the Product actually contains significant levels of unsafe, toxic PFAS chemicals.

103.     Defendants thus violated, and continue to violate, § 349 of the New York General Business Law ("NYGBL"), which makes deceptive acts and practices unlawful.  As a direct and proximate result of Defendants' violations of § 349, Plaintiff Accardi and other members of the New York Subclass have suffered damages in an amount to be determined at trial.

104.     Defendants' improper consumer-oriented conduct is misleading in a material way in that it, *inter alia*, induced Plaintiff Accardi and the New York Subclass members to purchase and pay the requested price for the Product when they otherwise would not have or would not have purchased on the same terms.

105.    Defendants made the untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

106.    Plaintiff Accardi and the New York Subclass members have been injured by their purchase of the Product, which was worth less than what they bargained and/or paid for, and which they selected over other products that may have been truthfully marketed.

107.    By reason of the foregoing, Plaintiff Accardi and the New York Subclass members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 349(h).

<u>**COUNT V**</u>
**Violation of New York General Business Law § 350**
**(On Behalf of the New York Subclass)**

108.    Plaintiff Accardi incorporates the foregoing allegations as if fully set forth herein.

109.    Plaintiff Accardi brings this claim on behalf of herself and the New York Subclass.

110.    Each of the acts of Defendants, as described above, constitute unlawful, deceptive, and fraudulent business acts and practices.

111.    New York General Business Law § 350 declares unlawful any "[f]alse advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in [New York] state[.]"

112.    NYGBL § 350-a defines "false advertising" in relevant part, as "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect."

113.    Plaintiff Accardi and the members of the New York Subclass are consumers who purchased Defendants' Product in New York and/or ordered this Product online from their homes in New York to be delivered to their homes in New York.

114.    As a seller of goods to the consuming public, Defendants engaged in the conduct of business, trade, or commerce, within the intended ambit of § 350.

115.    Defendants' representations (made by statement, word, design, device, sound, or any combination thereof), and the extent to which Defendants' advertising has failed to reveal material facts with respect to its product, as described above, constitute false advertising in violation of § 350.

116.    Defendants knew, or reasonably should have known, that their advertising of the Product is false.  Defendants are manufacturers, marketers, and sellers of the Product and thereby are privy to the production, marketing, labeling processes that create and put the Product into commerce.  Defendants were in the best position to know of, and test for, the quality and safety of the Product but nonetheless chose to continue their course of marketing.

117.    Defendants' actions led to direct, foreseeable, and proximate injury to Plaintiff Accardi and the members of the New York Subclass.

118.    As a consequence of Defendants' deceptive marketing scheme, Plaintiff Accardi and the other members of the New York Subclass suffered an ascertainable loss, insofar as they would not have purchased the Product had the truth been known or would not have paid the requested price of the Product; moreover, as a result of Defendants' conduct, Plaintiff Accardi and the other members of the New York Subclass received the Product at a lesser value than what they paid for.

119.    By reason of the foregoing, Plaintiff Accardi and the New York Subclass members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 350-e(3).

## COUNT VI
### Fraud
### (On Behalf of the Nationwide Class)

120.    Plaintiffs Watkins and Accardi incorporate the foregoing allegations as if fully set forth herein.

121.    Plaintiffs Watkins and Accardi bring this claim on behalf of themselves and on behalf of the Nationwide Class.

122.    Plaintiffs bring this claim under the laws of the State of California.

123.    At the time Plaintiffs and members of the Nationwide Class purchased the Product, Defendants did not disclose, but instead concealed and misrepresented, that the Product was not wholly made of natural ingredients, and thus unsafe to swallow because of the presence of PFAS chemicals.

124.    Defendants affirmatively misrepresented the Product was of a wholly natural composition, safe to swallow, and made to be one of the healthiest children's toothpaste products on the market.

125.    Defendants also knew that its omissions and misrepresentations regarding the Product were material, and that a reasonable consumer would rely on Defendant's representations and warranties (and corresponding omissions) in making purchase decisions.

126.    Plaintiffs and Nationwide Class did not know—nor could they have known through reasonable diligence—about the true nature of the Product.

127.    Plaintiffs and the Nationwide Class have reasonably relied on Defendant's misrepresentation (and corresponding omissions) in making their purchase decisions.

128.    Plaintiffs and the Nationwide Class have a right to rely upon Defendant's representations (and corresponding omissions), as Defendant maintained monopolistic control over knowledge of the true quality of the Product.

129.    Plaintiffs and members of the Nationwide Class sustained damages as a result of their reliance on Defendant's omissions and misrepresentations, thus causing Plaintiffs and the Nationwide Class to sustain actual losses and damages in a sum to be determined at trial, including punitive damages.

<u>**COUNT VII**</u>
**Fraudulent Concealment or Omission**
**(On Behalf of the Nationwide Class)**

130.    Plaintiffs Watkins and Accardi incorporate the foregoing allegations as if fully set forth herein.

131.    Plaintiffs Watkins and Accardi bring this claim individually and on behalf of the Nationwide Class.

132.    Plaintiffs bring this claim under the laws of the State of California.

133.    At all relevant times, Defendants were engaged in the business of designing, manufacturing, and selling the Product.

134.    Defendants, acting through their representatives or agents, delivered the Product to its distributors and through various channels to consumers.

135.    Defendants willfully, falsely, and knowingly omitted material information and made material, affirmative misrepresentations regarding the quality and character of the Product as discussed throughout.

136.    Rather than inform consumers of the truth regarding the Product, Defendants misrepresented the quality of the Product as discussed herein at the time of purchase.

137.    Defendants made these material omissions and material, false misrepresentations to boost or maintain sales of the Product and to falsely assure purchasers of the Product that its Product is a safer, natural toothpaste.  The omitted information and partial representations were material to consumers because the representations played a significant role in the value of the Product purchased.

138.    Plaintiffs and Classes had no way of knowing that Defendant's representations were false and misleading.

139.    Defendants had a duty to ensure the accuracy of the information regarding the Product because it was in exclusive knowledge of this information and the information pertains to matters of health, and Defendants did not fulfill that duty.

140.    Defendants misrepresented material facts partly to pad and protect its profits, as it saw that profits and sales of the Product were essential for its continued growth and to maintain and grow its reputation as a premier manufacturer and seller of the Product.  Such benefits came at the expense of Plaintiffs and the Nationwide Class.

141.    Plaintiffs and the Nationwide Class Members were unaware of these material misrepresentations, and they would not have acted as they did had they known the truth.  Plaintiffs' and Nationwide Class Members' actions were justified given Defendants' misrepresentations. Defendants were in the exclusive control of material facts and such facts were not known to the public.

142.    Due to Defendants' misrepresentations, Plaintiffs and Nationwide Class sustained injury due to the purchase of the Product, which did not live up to its advertised representation. Plaintiffs and the Nationwide Class are entitled to recover full refunds for the Product they purchased due to Defendants' misrepresentations.

1    143.    Defendants' acts were done maliciously, oppressively, deliberately, and with intent

2    to defraud, and in reckless disregard of Plaintiffs' and Nationwide Class Members' rights and well-

3    being, and in part to enrich itself at the expense of consumers.  Defendants' acts were done to gain

4    commercial advantage over competitors, and to drive consumers away from consideration of

5    competing products.

6                                             **COUNT VIII**
                                    **Breach of Express Warranty**
7                              **(On Behalf of the Nationwide Class)**

8    144.    Plaintiffs Watkins and Accardi incorporate the foregoing allegations as if fully set

9    forth herein.

10    145.    Plaintiffs Watkins and Accardi bring this claim individually on behalf of themselves

11    and the Nationwide Class.

12    146.    Plaintiffs bring this claim under the laws of the State of California.

13    147.    Plaintiffs and Nationwide Class Members formed a contract with Defendants at the

14    time Plaintiffs and Nationwide Class Members purchased the Product.

15    148.    The terms of the contract include the promises and affirmations of fact made by

16    Defendants on the Product packaging and through marketing and advertising, as described above.

17    149.    This labeling, marketing, and advertising constitute express warranties and became

18    part of the basis of the bargain and are part of the standardized contract between Plaintiffs and

19    Nationwide Class Members.

20    150.    As set forth above, Defendants purport through its advertising, labeling, marketing,

21    and packaging, to create an express warranty that the Product is safe for their intended use.

22    151.    Plaintiffs and Nationwide Class Members performed all conditions precedent to

23    Defendants' liability under this contract when they purchased the Product.

24    152.    Defendants breached express warranties about the Product and its qualities because,

25    despite Defendants' warranties that the Product is made wholly from natural ingredients, is safe to

26    swallow, and is free from toxic ingredients, the Product is objectively not safe for use because of

27    the inclusion of harmful, toxic, PFAS chemicals.  Thus, the Product does not conform to

28    Defendants' affirmations and promises described above.

153.    Plaintiffs and each Nationwide Class Member would not have purchased the Product had they known the true nature of the Product.

154.    As a result of Defendants' breach of express warranty, Plaintiffs and each Nationwide Class Member suffered and continue to suffer financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

**COUNT IX**
**Negligent Misrepresentation**
**(On Behalf of the Nationwide Class)**

155.    Plaintiffs Watkins and Accardi incorporate the foregoing allegations as if fully set forth herein.

156.    Plaintiffs Watkins and Accardi bring this claim individually and on behalf of the Nationwide Class.

157.    Plaintiffs bring this claim under the laws of the State of California.

158.    Defendants had a duty to Plaintiffs and the Nationwide Class to exercise reasonable and ordinary care in the development, testing, manufacturing, marketing, detailing, distribution, and sale of the Product.

159.    Defendants breached its duty to Plaintiffs and the Nationwide Class by developing, testing, manufacturing, marketing, detailing, distributing, and selling the Product to Plaintiffs and the Nationwide Class which did not have the qualities, characteristics, safety, and suitability for use as advertised by Defendants when they represented and warranted that the Product is wholly free of harmful toxins, safe to swallow, and therefore one of the safest children's toothpastes available for purchase.

160.    Defendants knew or should have known that the qualities and characteristics of the Product were not as advertised, marketed, detailed, or otherwise represented or suitable for its intended use and were otherwise not warranted and represented by Defendants.  Defendants were best positioned to properly test for the presence of toxic, harmful chemicals, but failed to adequately do so, and nonetheless continued to represent and warrant that the Product was free of toxic, harmful chemicals.

161.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Nationwide Class suffered actual damages in that they would not have purchased the Product had they known the Product was not actually safe for use or for sale as warranted and that the Product does not conform to the labeling, packaging, advertising, representations, and warranties.

162.    Plaintiffs and the Nationwide Class seek actual damages, attorneys' fees, costs, and any other just and proper relief available.

### COUNT X
### Unjust Enrichment
### (On Behalf of the Nationwide Class)

163.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

164.    Plaintiffs bring this claim under the laws of the State of California.

165.    To the extent required by this law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

166.    Plaintiffs and members of the Nationwide Class conferred benefits on Defendants by purchasing the Product.

167.    Defendants were unjustly enriched in retaining the revenues derived from Plaintiffs and members of the Nationwide Class' purchases of the Product.  Retention of those monies under these circumstances is unjust and inequitable because Defendants failed to disclose that the Product contained toxic substances, rendering its 100% safe, non-toxic, and safe to swallow representations false and misleading.  These omissions caused injuries to Plaintiffs and members of the Nationwide Class because they would not have purchased the Product if the true facts were known.

168.    Because Defendants' retention of the non-gratuitous benefits conferred on them by Plaintiffs and members of the Nationwide Class is unjust and inequitable, Defendants have been unjustly enriched in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and behalf of all others similarly situated, seek judgment against Defendant, as follows:

a)    For an order certifying the Classes under Fed. R. Civ. P. 23 and naming Plaintiffs as representatives of the Classes, and Plaintiffs' Counsel as Class Counsel;

b) For an order declaring that Defendants' conduct violates the statutes referenced herein;

c) For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e) For prejudgment interest on all amounts awarded;

f) For an order of restitution and all other forms of equitable monetary relief;

g) For injunctive relief as pleaded or as the Court may deem proper;

h) For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiffs demand a trial by jury of all issues so triable.

Dated: June 11, 2024                    **BURSOR & FISHER, P.A**.

By: ___*/s/ L. Timothy Fisher*___
        L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
Joshua R. Wilner (State Bar No. 353949)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-mail: ltfisher@bursor.com
            jwilner@bursor.com
            jglatt@bursor.com

*Attorneys for Plaintiffs*

## CLRA VENUE DECLARATION

I, L. Timothy Fisher, declare as follows:

      1.     I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court. I am a partner at Bursor & Fisher, P.A., counsel of record for Plaintiffs. Plaintiff Watkins resides in Santa Cruz, California.  Plaintiff Accardi resides in Staten Island, New York.  I have personal knowledge of the facts set forth in this declaration and as called as a witness, I could and would completely testify thereto under oath.

      2.     The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the events alleged in the Complaint occurred in the Northern District of California, as Plaintiff Watkins purchased the Product from her home while in this District.  Additionally, Defendant advertised, marketed, manufactured, distributed, and/or sold the Product at issue to Class Members in this District.

      3.     I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Walnut Creek, California this June 11, 2024.

                                 */s/ L. Timothy Fisher*
                                 L. Timothy Fisher